UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

In re:                                             Case No. 3:13-bk-2575-PMG

Robert Michael Mitchell, Sr.,

_____Debtor._____               Chapter 7

Edwards Family Partnership, LP,

      Plaintiff,

vs.                                                Adv. No. 3:14-ap-297-PMG

Robert Michael Mitchell, Sr.,

_____Defendant._____

FINDINGS OF FACT, CONCLUSIONS OF LAW,
AND MEMORANDUM OPINION

**THIS CASE** came before the Court for a final evidentiary hearing to consider the Complaint to Determine Dischargeability of Debt and Objecting to Debtor's Discharge filed by the Edwards Family Partnership, LP (the Plaintiff). (Doc. 1).

Under §523(a)(2)(B) of the Bankruptcy Code, a particular debt may be nondischargeable if (1) it was obtained by a materially false written financial statement, (2) the debtor made the financial

1

statement with the intent to deceive, and (3) the creditor reasonably relied on the statement in extending credit.

Under §727(a)(5) of the Bankruptcy Code, a debtor's discharge may be denied as to all of his debts if he fails to explain satisfactorily a loss of assets or a deficiency of assets to meet his liabilities.

In this case, the Plaintiff loaned Robin Bay Realty, LLC the sum of $15 million in 2007, and loaned Bamaco, Inc. the sum of $650,000.00 in 2011. The Debtor guaranteed the loans. Before each transaction, the Debtor represented in writing to the Plaintiff that his net worth exceeded the sum of $250 million, and that his assets included a fine art collection valued at $200 million.

On April 26, 2013, the Debtor filed a petition under Chapter 11 of the Bankruptcy Code, which was later converted to a case under Chapter 7 of the Bankruptcy Code. After the bankruptcy case was filed, it was determined that the majority of the Debtor's fine art collection was not authentic, and the estate realized the sum of only $57,742.50 for the sale of the collection.

At trial, the Debtor submitted no evidence to show when he acquired the artwork, where it was acquired, or how much he paid for it. Based on the Debtor's failure to provide even minimal support for his misrepresentation of the artwork's value, the Court finds that the Debtor's prepetition written financial statements were used with the intent to deceive the Plaintiff within the meaning of §523(a)(2)(B) of the Bankruptcy Code.

Additionally, the Debtor has not provided any records or documentation in his bankruptcy case to explain the disposition or location of a "boat condo," which he claimed to be worth at least $1 million, or to explain the enormous discrepancy between his prepetition financial statements and the assets actually recovered in his bankruptcy case. Under these circumstances, the Court finds that the Debtor

failed to explain satisfactorily a loss of assets within the meaning of §727(a)(5) of the Bankruptcy Code.

## Background

The Debtor filed a petition under Chapter 11 of the Bankruptcy Code on April 26, 2013, and the case was converted to a case under Chapter 7 on January 6, 2014. At the time that the petition was filed, the Debtor was the owner and president of Bamaco, Inc. (Bamaco), a "disaster management company" located in Flagler County, Florida. (Main Case, Docs. 26, 32).

### A. The 2007 transaction

Bamaco was a shareholder of a separate entity known as Robin Bay Realty, LLC (Robin Bay), and the Debtor was a manager of Robin Bay. In September of 2006, Robin Bay entered into a contract to purchase approximately 622 acres of waterfront real property in St. Croix, Virgin Islands, and asked the Plaintiff to finance the acquisition.

In connection with the request, the Debtor agreed to guarantee the loan, and furnished a Statement of Financial Condition dated August 3, 2006, to the Plaintiff. The Financial Statement was presented to the Plaintiff as reflecting the personal assets of the Debtor and Beverly R. Mitchell, and included the following property:

> **Cash and Short-Term Investments - $30,000,000**
> Transportation Equipment - $3,880,500
> Personal Residence - $6,500,000
> Real Estate Holdings and Investments - $11,000,000
> **Personal Effects - $6,000,000**
> Notes Receivable - $472,000
> **Fine Art Collection - $200,000,000**
> 100% Equity Interest in BAMACO, Inc. at book value
>     as of March 31, 2006 (most recent statement) - $18,097,000
>
> **TOTAL ASSETS - $275,949,500**

3

(Exhibit 46)(Emphasis supplied). The Financial Statement also reflected liabilities owed by the Debtor in the amount of $19,935,000.00. According to the Financial Statement, therefore, the Debtor's total net worth amounted to the sum of $256,014,500.00. (Exhibit 46).

In January of 2007, the Plaintiff loaned the sum of $15 million to Robin Bay, as evidenced by a Promissory Note that was signed by the Debtor on behalf of Robin Bay. Pursuant to the Note, the principal balance and all accrued interest on the loan was due on December 1, 2008. (Attachment to Exhibit 8).

On January 6, 2007, the Debtor also signed a Guaranty of Payment and Performance, in which he unconditionally guaranteed full payment of the Plaintiff's loan to Robin Bay. According to its terms, the purpose of the Guaranty was to "provide extra security to Lender to cause Lender to issue the Loan to Borrower." (Exhibit 8).

The Plaintiff has filed a Proof of Claim in the Debtor's bankruptcy case in the amount of $62,254,677.00 based on the 2007 Promissory Note and Guaranty (Exhibit 8), and the Debtor has stipulated that the debt identified in the Claim is "undisputed, liquidated, and non-contingent." (Exhibit 40, ¶ 11).

**B. The 2011 transaction**

In 2011, more than four years after the loan to Robin Bay, Bamaco asked the Plaintiff for a loan for the purpose of funding its disaster response operations, and the Debtor again agreed to guarantee the loan.

In connection with the second loan request and guarantee, the Debtor furnished to the Plaintiff a Statement of Financial Condition dated June 30, 2011, with a cover sheet dated September 30, 2011. In the 2011 Financial Statement, the Debtor's assets were reflected as follows:

4

      **Cash and Short-Term Investments - $28,602,000**
      Transportation Equipment - $780,500
      Personal Residence - $6,500,000
      Real Estate Holdings and Investments - $11,000,000
      **Personal Effects - $6,000,000**
      Notes Receivable - $472,000
      **Fine Art Collection - $210,000,000**
      Equity Interest in BAMACO, Inc at Book Value - $10,000,000

      **TOTAL ASSETS - $273,354,500**

(Exhibit 7)(Emphasis supplied). The Financial Statement also reflected liabilities owed by the Debtor in the amount of $22,972,000.00. According to the Financial Statement, therefore, the Debtor's total net worth as of September of 2011 amounted to the sum of $250,382,500.00. (Exhibit 7).

On October 30, 2011, the Plaintiff loaned Bamaco the sum of $650,000.00, as evidenced by a Promissory Note signed by the Debtor on behalf of Bamaco. The Note contains the handwritten provision that the loan is secured by "art appraised at no less than $4 million and selected from Borrower's collection by Dr. Edwards." (Exhibit 9).

In connection with the 2011 transaction, the Debtor signed a second Guaranty of Payment and Performance in which he unconditionally guaranteed full payment of the Plaintiff's loan to Bamaco. (Exhibit 9).

The Plaintiff has filed a Proof of Claim in the Debtor's bankruptcy case in the amount of $915,030.00 based on the 2011 Note and Guaranty (Exhibit 9), and the Debtor has stipulated that the debt identified in the Claim is "undisputed, liquidated, and non-contingent." (Exhibit 40, ¶ 11).

### C. The bankruptcy schedules

The Debtor filed his Chapter 11 petition on April 26, 2013. On May 29, 2013, the Debtor filed his original schedule of assets in the bankruptcy case.

On his schedule of assets, the Debtor listed real property with a total scheduled value of $2,884,000.00. The listed real property included a "Condo Cruise Lines – Unit 709 Luxury Suite – Condo," with a scheduled value of $1 million, and with no scheduled liens.

On his original schedule of assets, the Debtor also listed personal property with a total scheduled value of $37,957.00. The listed personal property includes the following description with an unknown value:

> Coin Collection, Stamp Collection, Comic Book Collection, Knife Collection, Oriental and other rugs **and Misc. Fine Art: to be appraised; value unknown, but expected to exceed $1,000,000**. Location: 6869 West Hwy 100, Bunnell FL 32110.

(Main case, Doc. 26)(Emphasis supplied).

On August 15, 2013, the Debtor filed an Amended Schedule of Personal Property to describe his collections as follows:

> **Fine Art Collection – Amended to attach detailed description – value unknown, to be appraised.** Location: 6869 West Hwy 100, Bunnell FL 32110
>
> Comic Book collection – Amended to add value of collection. Location: 6869 West Hwy 100, Bunnell FL 32110

(Main case, Doc. 61)(Emphasis supplied). The "detailed description" of the fine art collection attached to the amended schedule is identified as a draft inventory of the "Mitchell Art Collection" dated August 8, 2013. The inventory is a single page identifying 57 artists by name or category, and stating the number of pieces attributable to each artist. The inventory includes, for example, 1 piece by Edgar Degas, 1 piece by Leonardo Da Vinci, 14 pieces by Mark (sic) Chagall, 54 pieces by Pablo Picasso, 323 pieces by Rembrandt, and 45 pieces by Salvador Dali. According to the inventory, a total of 1,785 pieces were held in the collection. (Main case, Doc. 61).

On his schedule of liabilities filed in the bankruptcy case, the Debtor listed creditors holding secured claims in the total amount of $3,493,687.58, and creditors holding general unsecured claims in the total amount of $55,567,393.78. (Main case, Doc. 26).

**Discussion**

On August 4, 2014, the Plaintiff filed the Complaint that is currently before the Court. The Complaint as filed contains four counts to determine the dischargeability of the debt owed by the Debtor to the Plaintiff under §523 of the Bankruptcy Code, and three counts to deny the Debtor's discharge under §727 of the Bankruptcy Code. At trial, the Plaintiff focused the presentation of its evidence on its claims under §523(a)(2)(B) and §727(a)(5) of the Bankruptcy Code.

**A. Section 523(a)(2)(B)**

"Under 11 U.S.C. §523(a)(2)(B), a debt is non-dischargeable in bankruptcy where it was obtained by a writing: (1) that is materially false; (2) respecting the debtor's or an insider's financial condition; (3) on which the creditor to whom the debt is liable for such money, property, services, or credit reasonably relied; and (4) that the debtor caused to be made or published with the intent to deceive." In re Miller, 39 F.3d 301, 304 (11th Cir. 1994).

In this case, the Statement of Financial Condition dated August 3, 2006, and the Statement of Financial Condition dated September 30, 2011, clearly were writings respecting the Debtor's financial condition. In other words, they concerned "what may be described as the debtor or insider's net worth, overall financial health or equation of assets and liabilities." In re Savage, 2016 WL 856016, at 6 (Bankr. N.D. Ala.)(Citations omitted). For purposes of determining nondischargeability under §523(a)(2)(B), therefore, the Court finds that the Plaintiff has shown the existence of a written financial statement. The real issues in this case involve the other three elements of §523(a)(2)(B).

7

### 1. Materially false

First, the Plaintiff must show that the financial statement was materially false. 11 U.S.C. §523(a)(2)(B)(i).

"A statement is materially false for purposes of section 523(a)(2)(B) if it paints a substantially untruthful picture of financial conditions by misrepresenting information of the type that would normally affect the decision to grant credit." In re Savage, 2016 WL 856016, at 6(quoting In re Greene, 2013 WL 6911376, at 2 (Bankr. N.D. Ga.)).

The financial statements sent to the Plaintiff in this case were materially false. The predominant example of a materially false representation in the financial statements is the Debtor's valuation of his fine art collection.

The fine art collection is valued at $200 million in the 2006 financial statement, and $210 million in the 2011 financial statement. (Exhibits 7, 46). The Debtor represented the art collection as including original works by artists such as Rembrandt, Picasso, and Dali. (Transcript, pp. 40, 91-92, 120).

Subsequent investigations by the Plaintiff and bankruptcy estate have determined that the majority of the art collection either was not authentic or was grossly overvalued. Examples of the misrepresented art include the following:

> 1. The Debtor claimed to own 323 pieces by Rembrandt. The pieces were not original works, were not created by Rembrandt, and could be purchased in books on eBay for approximately $300.00. (Transcript, pp. 40, 91).
>
> 2. The Debtor claimed to own 54 pieces by Picasso worth a combined value of approximately $35 million. The works were not original Picasso pieces, and were assessed by Picasso experts to be "obvious fakes." (Transcript, pp. 91-92).

8

3. The Debtor claimed to own 21 pieces by Renoir. All of the Renoir works were prints, and not original pastels. (Transcript, p. 93).

4. The Debtor claimed to own 45 pieces by Salvador Dali. The pieces were not original works by Dali, but were instead photographs of the originals. (Transcript, pp. 29, 48, 93).

5. The Debtor claimed to own 976 pieces created by Zamy Steynovitz, and claimed that the pieces were very valuable because of the artist's death. In fact, there was no market for the work, and the pieces yielded an aggregate of no more than $10,000.00 for the bankruptcy estate. (Transcript, pp. 42-44, 91).

The Chapter 7 Trustee has auctioned all of the Debtor's artwork that was recovered by the bankruptcy estate, and received the total sum of $57,742.50 for the entire collection. (Exhibit 10; Transcript, pp. 28-29).

Another example of a materially false representation in the financial statements concerns the Debtor's valuation of his personal effects. Specifically, the Debtor's personal effects were valued at $6 million in both the 2006 financial statement and the 2011 financial statement, and it appears that the personal effects included a coin collection located at the Debtor's home. In correspondence to the Plaintiff, the Debtor represented that his coin collection included a "1795 $5:00 gold coin . . . the first gold coin ever minted by the us government," valued at $175,000.00, and the "rarest of all coins," an 1804 silver dollar valued at more than $4 million. (Exhibit 50).

The coins were not authentic, and the estate recovered less than $4,225.00 from the sale of the collection. (Exhibit10; Transcript, pp. 30, 49-50).

In summary, the financial statements given to the Plaintiff in 2006 and 2011 reflected a fine art collection valued at $200 million or more, but the collection was largely spurious and yielded only $57,742.50 for the estate. Additionally, the financial statements included a coin collection among the Debtor's personal effects valued at $6 million, but the coin collection also was largely spurious and

9

yielded less than $4,225.00 for the estate. The financial statements were materially false, in that they inaccurately represented the authenticity and value of the Debtor's art collection and personal effects, and the falsehoods were significant to the Plaintiff in both amount and effect. In re Purse, 2015 WL 5042222, at 6 (Bankr. S.D. Ga.).

### 2. Reasonable reliance

For the next required element under §523(a)(2)(B) of the Bankruptcy Code, a creditor must show that he reasonably relied on the false financial statement. 11 U.S.C. §523(a)(2)(B)(iii).

"Whether a creditor's reliance was reasonable is a factual determination to be made in light of the totality of the circumstances," and factors to consider in evaluating the creditor's reasonableness include (1) whether the creditor had a prior relationship with the debtor, (2) whether there were any "red flags" that would have alerted the creditor to the falsity of the statements, and (3) whether "even minimal investigation would have revealed the inaccuracy of the debtor's representations." In re Purse, 2015 WL 5042222, at 7(quoting In re Ledford, 970 F.2d 1556, 1560 (6th Cir. 1992), *cert. denied*, 507 U.S. 916 (1993)).

In this case, the Court finds that the Plaintiff relied on the Debtor's financial statements in making the loans in 2007 and 2011. According to the Plaintiff, for example, the acquisition and development of the real property in St. Croix was a very speculative project, and he therefore was looking to the Debtor's guarantee to provide the primary security for the loan. (Transcript, pp. 70-71).

Further, the Court finds that the Plaintiff's reliance was reasonable. The circumstances that establish the reasonableness of the Plaintiff's reliance include the following:

    1. The Plaintiff was introduced to the Debtor by a business broker that the Plaintiff knew independently, and with whom the Plaintiff had prior business dealings. (Transcript, pp. 57, 99).

10

2. The Plaintiff asked for and received a catalogue and assessment of the artwork prior to making the loan. (Transcript, pp. 62-63, 99). Specifically, the Plaintiff received a catalogue consisting of two books containing photographs and details for every major piece of art. (Transcript, pp. 67, 95, 99, 111).

3. Prior to making the loan in 2007, the Plaintiff received an evaluation of the artwork performed by Jerry Bengis, an individual recommended to the Plaintiff by the business broker. Mr. Bengis annotated the catalogue of artwork with his estimated value for many of the items, and claimed to corroborate a value for the collection of approximately $76 million. (Transcript, pp. 77, 101, 103, 111).

4. The Plaintiff visited the Debtor's home and adjacent building in Bunnell, Florida, on two days in December of 2006 and personally viewed the art collection. (Transcript, pp. 67-68, 94-95, 100, 103-04).

5. The Plaintiff learned that the Debtor previously owned an art gallery in Winter Park, Florida. (Transcript, p. 94).

6. The Plaintiff verified the Debtor's ownership of certain real property investments by researching the relevant tax records. (Transcript, p. 102).

7. The Plaintiff reviewed financial statements related to Bamaco, Inc. that were prepared by certified public accountants, and which appeared to reflect a successful business. (Transcript, p. 76).

Based on the information obtained prior to the loans, the Plaintiff could reasonably determine that the Debtor was an individual who had amassed great wealth through his business enterprises and investments, and who was a legitimate dealer and collector of fine art. The Plaintiff also could reasonably determine that the art collection held by the Debtor included authentic works by known artists, which were originally acquired either personally or for his gallery, and that the value of the collection was at least sufficient to provide security for the loans that he was extending to Robin Bay and Bamaco.

The Plaintiff reasonably relied on the Debtor's financial statements in making the loans to Robin Bay and Bamaco, as required by §523(a)(2)(B) of the Bankruptcy Code.

11

### 3. Intent to deceive

For the final required element under §523(a)(2)(B) of the Bankruptcy Code, a creditor must show that the debtor caused the financial statement to be made or published with the intent to deceive. 11 U.S.C. §523(a)(2)(B)(iv).

With respect to intent, "[A] court may look to the totality of the circumstances, including the recklessness of a debtor's behavior, to infer whether a debtor submitted a statement with intent to deceive. 'Reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation may combine to produce the inference [sic] of intent [to deceive].'" Counsel Financial Services LLC v. Wood, 2014 WL 1155580, at 8 (N.D. Ala.)(quoting In re Miller, 39 F.3d 301, 305 (11th Cir. 1994)(quoting In re Albanese, 96 B.R. 376, 380 (Bankr. M.D. Fla. 1989)).

In this case, the Court finds that the Debtor intended to deceive the lender by submitting his financial statements to the Plaintiff in 2007 and 2011. At a minimum, the Debtor's conduct demonstrates a reckless disregard for the truth or falsity of the information contained in the financial statements, as shown by the following evidence:

> 1. The Debtor testified that he had "no way of knowing" how much he had actually invested in the art collection, and that he had no records regarding how much he had paid for any of the artwork. (Exhibit 34, p. 128). In fact, the Examiner's Report in the Chapter 11 case states that the Debtor was unable to provide basic information regarding his purchase of the art, and also that he was unable to provide any support for the values on the financial statements. (Exhibit 1, pp. 2-3).
>
> 2. The artwork did not reflect the "provenance," or origin, of the pieces. (Transcript, pp. 46, 93). In other words, there were no dealer stamps, gallery labels, or any other indications of prior ownership on the backs of the pieces, and therefore no indications that the Debtor had ever authenticated the items.
>
> 3. The Debtor testified that he obtained his appraisal from a Wachovia bank employee who inspected the art collection and provided the value of $200 million that appears in the financial statements. (Transcript, pp. 121, 129). The Debtor offered no

12

other explanation for the value, and no additional information was presented regarding the bank employee's qualifications or appraisal methods.

    4. Jerry Bengis, who was engaged to appraise the art collection for the Plaintiff, had prior dealings and undisclosed communications with the Debtor regarding the value of the art. (Transcript, pp. 79, 104, 110-11, 126-27).

    5. In conversations with the auctioneer for the bankruptcy estate, the Debtor indicated that he had not been concerned with the authenticity of the artwork. Instead, his primary approach to the collection was to create a market for the individual pieces through promotional efforts. (Transcript, pp. 41-42).

    6. The Debtor claimed in an email to the Plaintiff that an 1804 silver dollar was worth $4 million, but that the coin would not appear on an inventory because "this coin I do not want shown to anybody." (Exhibit 50). The coin ultimately was determined to be fake. (Transcript, pp. 49, 69).

At a minimum, the Debtor's conduct demonstrates a reckless disregard for the truth or falsity of the information contained in the financial statements. An art collection purportedly valued at more than $200 million represented an investment of enormous scope, but the Debtor did not present a single document to show where he had acquired the pieces or how much he had paid for them. In other words, the Debtor has made no effort to validate the value that he placed on the collection, either before he presented the financial statements to the Plaintiff, or after the filing of his bankruptcy petition.

Further, the evidence indicates that the Debtor is cavalier regarding the collection's authenticity and value, as shown by his undisclosed relationship with the appraiser who was recommended to the Plaintiff, by his primary interest in marketing or promoting the pieces regardless of their value, and by his stated desire for secrecy regarding the most valuable and "rarest of all coins."

For these reasons, the Court finds that the Debtor caused the financial statements to be made or published with the intent to deceive the Plaintiff within the meaning of §523(a)(2)(B).

13

### 4. Nondischargeability

For the reasons discussed in this section, the Court finds that the debt owed by the Debtor to the Plaintiff is nondischargeable under §523(a)(2)(B) of the Bankruptcy Code, because it was obtained by a written financial statement that was materially false, because the Plaintiff reasonably relied on the financial statement, and because the Debtor intended to deceive the Plaintiff by using the false financial statement.

### B. Section 727(a)(5)

For a debtor's general discharge to be denied under §727(a)(5) of the Bankruptcy Code, the plaintiff must show that the debtor failed to explain satisfactorily a loss of assets or a deficiency of assets to meet his or her liabilities. The determination of whether an explanation is satisfactory is left to the discretion of the Court, which may consider all relevant circumstances. In re Jones, 2016 WL 492439, at 4 (Bankr. M.D. Fla.)(citing In re Kane, 470 B.R. 902, 934 (Bankr. S.D. Fla. 2012)).

In this case, the Court finds that the Debtor has failed to satisfactorily explain the loss of assets in at least two respects.

### 1. The Cruise Condo

First, the Debtor has not explained the disposition or location of a "boat condo" that he claims to have purchased. Specifically, the Debtor made the following representation to the Plaintiff in correspondence dated December 17, 2006:

> Property #22 is The Condo Cruise Line International condo that I bought into over a year ago. It is scheduled to depart on its first cruise early next year. I am sure without a doubt that I could get $1,200,000 for this unit.

(Exhibit 48). The asset was listed on the Debtor's bankruptcy schedules as "Condo Cruise Lines – Unit 709 Luxury Suite – Condo," with a scheduled value of $1 million, and the Debtor provided a

14

"Purchase Document" to the Chapter 11 Examiner indicating that he had paid the sum of $100,000.00 for the cruise condo in January of 2006. (Main Case, Doc. 26; Exhibit H to Exhibit 1).

Despite the Debtor's claim that he owned an asset worth $1 million, the Chapter 7 Trustee testified that he "didn't get any information on the boat. We don't even know what boat we're looking for, so we recovered nothing." (Transcript, pp. 24-25). The Trustee's Estate Property Report shows that no amount has been realized on account of the "boat condo," and the Debtor has furnished no evidence regarding the location or disposition of the asset.

### 2. Discrepancies with the Debtor's statements

Second, the Debtor has not explained the disposition of other personal and investment property that he claimed to own shortly before his bankruptcy case was filed.

The Debtor acknowledged that he is responsible for the prepetition financial statement reflecting a net worth of $250,382,500.00. (Transcript, pp. 119, 130, 133; Exhibit 7). The financial statement is dated as of September 30, 2011, less than two years before the filing of his bankruptcy petition on April 26, 2013. The Debtor's schedule of assets filed in the bankruptcy case, however, lists real and personal property valued at $2,922,257.00, and the Debtor's Statement of Financial Affairs lists no transfers outside the ordinary course of the Debtor's business within the two years before the case was filed. (Main case, Docs. 26, 61).

The Chapter 7 Trustee's Estate Property Report for the period ending February 25, 2016, shows that the estate has received the total sum of $130,642.50 for the sale or liquidation of the Debtor's assets. (Exhibit 10).

The difference between the net worth claimed by the Debtor in 2011, and the amount recovered by the bankruptcy estate exceeds $250 million. Despite the magnitude of the discrepancy, however,

15

the Debtor has produced no records to account for the assets that comprised the prepetition net worth that he had claimed.

The Chapter 7 Trustee testified that the Debtor did not furnish any records to identify the assets listed in the financial statements and schedules. According to the Trustee, for example, the Debtor had listed "cash and short-term investments" totaling $28,000,602.00 on the 2011 financial statement, and indicated that the funds were used for offshore projects in which he was involved. The Trustee testified, however, that the Debtor never provided any records to identify the projects, did not produce any documentation "that led us to determine where anything was," and did not explain what happened to the substantial cash and borrowed funds that he had received. (Transcript, pp. 23, 30, 32-33).

Additionally, the Examiner appointed in the Chapter 11 case wrote in her report:

> 9. Mr. Mitchell on behalf of his estate and the Bamaco estate was unable to provide basic information regarding when, where and how much he paid for his collection of art and other collectibles other than to say he has more than 1,000 pieces of art and he has been collecting art for years.
>
> 10. Mr. Mitchell provided statements of financial condition (Schedule 3 and Exhibit A) and Bamaco financial statements (Exhibit B) to creditors during the years preceding the bankruptcy filings. Mr. Mitchell was unable to explain or provide documentation that supports the values and changes in the values of the significant assets included in the statements.

(Exhibit 1, pp. 2-3). According to the Examiner, the Debtor testified that some pieces of the fine art collection "may have been stolen or otherwise transferred to his ex-wife, Beverly Richardson." (Exhibit 1, p. 4).

Finally, the Plaintiff testified at trial that a number of pieces in the Debtor's art collection were missing from the items turned over in the bankruptcy case. Specifically, he testified that a 2011

16

inventory from the Debtor included 113 pieces that were not found by an appraiser hired during the bankruptcy case. (Transcript, pp. 109, 113-14).

Significantly, the Debtor did not deny the Plaintiff's assertion that 113 items from his collection were not located post-bankruptcy. Instead, the Debtor's only response was that the 113 missing pieces were either acquired by his ex-wife during their divorce, or sold on eBay. (Transcript, pp. 121-22).

Based on this evidence, the Court finds that the Debtor has failed to explain satisfactorily a loss of assets or a deficiency of assets to meet his liabilities. The Debtor has not provided any information to explain the disposition or location of the "boat condo," for example, an asset that he claimed to be worth at least $1 million. Additionally, the Debtor has not provided any records or documentation to explain the enormous discrepancy between his prepetition statement of assets and the assets actually recovered in his bankruptcy case. In other words, the Court cannot determine what happened to the assets, or whether any of the assets are missing. In re Jones, 2016 WL 492439, at 9(citing In re Brown, 531 B.R. 236, 265 (Bankr. W.D. Mo. 2015)). The Debtor's discharge should be denied pursuant to §727(a)(5) of the Bankruptcy Code.

## Conclusion

The Plaintiff loaned Robin Bay Realty, LLC the sum of $15 million in 2007, and loaned Bamaco, Inc. the sum of $650,000.00 in 2011. The Debtor guaranteed the loans. Before each transaction, the Debtor represented in writing to the Plaintiff that his net worth exceeded the sum of $250 million, and that his assets included a fine art collection valued at $200 million.

On April 26, 2013, the Debtor filed a petition under Chapter 11 of the Bankruptcy Code, which was later converted to a case under Chapter 7 of the Bankruptcy Code. After the bankruptcy case was

filed, it was determined that the majority of the Debtor's fine art collection was not authentic, and the estate realized the sum of only $57,742.50 for the sale of the collection.

At trial, the Debtor submitted no evidence to show when he acquired the artwork, where it was acquired, or how much he paid for it. Based on the Debtor's failure to provide even minimal support for his misrepresentation of the artwork's value, the Court finds that the Debtor's written financial statement to the Plaintiff was used with the intent to deceive within the meaning of §523(a)(2)(B) of the Bankruptcy Code.

Additionally, the Court finds that the Debtor has failed to explain satisfactorily a loss of assets or a deficiency of assets to meet his liabilities. The Debtor has not provided any information to explain the disposition or location of a "boat condo," for example, an asset that he claimed to be worth at least $1 million. Further, the Debtor has not provided any records or documentation to explain the enormous discrepancy between his prepetition statement of assets and the assets actually recovered in his bankruptcy case. Under these circumstances, the Court finds that the Debtor's discharge should be denied pursuant to §727(a)(5) of the Bankruptcy Code.

Accordingly:

**IT IS ORDERED** that:

1. The debts owed by the Debtor, Robert Michael Mitchell, Sr., to the Plaintiff, Edwards Family Partnership, LP, are nondischargeable in the Debtor's Chapter 7 case pursuant to §523(a)(2)(B) of the Bankruptcy Code.

2. The amount of the nondischargeable debts shall be determined in accordance with the Stipulation and Agreement entered in the Debtor's main bankruptcy case on or about December 20, 2013, and approved by the Court on January 29, 2014.

3. The discharge of the Debtor, Robert Michael Mitchell, Sr., is denied pursuant to §727(a)(5) of the Bankruptcy Code.

4. A separate Final Judgment in favor of the Plaintiff, Edwards Family Partnership, LP, and against the Debtor, Robert Michael Mitchell, Sr., will be entered consistent with these Findings of Fact and Conclusions of Law.

**DATED** this 17th day of May, 2016.

**BY THE COURT**

PAUL M. GLENN
United States Bankruptcy Judge